{¶ 1} Plaintiff-appellant/cross-appellee, Video Shack, Inc., and defendants-appellees/cross-appellants, James Smith, Sr. and James Smith, Jr., appeal from a judgment of the Columbiana County Common Pleas Court delineating the parties' property lines on adjacent parcels of property and finding no merit in the Smiths' other claims.
 {¶ 2} A restatement of the facts set out in the trial court's July 19, 2001 judgment entry is helpful in understanding the background of this case. The parties own abutting parcels of land in Lisbon, Ohio. Smith owns two parcels known as the "white house" property and the "grange" property. Video Shack owns what is known as the "Video Shack" property. The Video Shack property is in the shape of an inverted "L" going along the east and north sides of the grange/white house property. The area where the two properties abut is covered in gravel and used mostly as a driveway for Video Shack. A large walnut tree sits in the disputed area. Marty Heckathorn, Jr. owns the house next to Video Shack. Marty Heckathorn, Sr. runs Video Shack, a small business renting videos and selling bait.
 {¶ 3} An old fence line runs behind the grange/white house property with a corner post in line with the walnut tree. The fence line continues toward a creek behind the white house. At one time, a shed sat on this line.
 {¶ 4} In 1991, an opportunity arose for Smith to have a free well drilled for his property. Smith discussed the location of the well with Heckathorn. The well was drilled inside the fence line. In 1995, Heckathorn had a survey done of the Video Shack property. The survey revealed that the walnut tree and the well were within the Video Shack property with the well sitting eight feet inside that line. Smith disputes this survey. Video Shack and Smith began to share the well. A line was run to Video Shack for a toilet and a sink.
 {¶ 5} Video Shack also began to use the water line to fill its fish tanks, which it drained and filled weekly. The water from the tanks drained into the gravel area. Smith began to experience a wet basement. He further noticed that his electric bill was increasing. Smith had a french drain installed between Video Shack and his building and a line was run to Video Shack for its downspouts. Heckathorn then began to drain his fish tanks into the downspouts.
 {¶ 6} A dispute arose between Smith and Heckathorn because of Smith's increased electric bill. Eventually, Smith cut off the well by turning off the electricity. Smith also believed that the drainage from the fish tanks was responsible for his wet basement. The relationship between the Smiths and the Heckathorns deteriorated. Smith eventually installed a new driveway and drainage system on the west side of his house between the white house and his building. Before this time, Smith had allowed parking for Video Shack in front of his building. But he blocked the area off, preventing further parking.
 {¶ 7} On December 30, 1999, Video Shack filed a complaint against Smith seeking to quiet title to its property and for certain injunctive relief. Smith then counterclaimed for, among other things, adverse possession and injunctive relief and joined the Heckathorns as party-defendants. The case proceeded to a bench trial. The trial court issued its judgment entry on July 19, 2001, finding Smith established ownership of the property between the survey line and the fence line on the northern side of his property and in the northeast corner of the property by adverse possession. However, it found Smith did not establish ownership by adverse possession on the eastern portion of the property. The trial court then ordered certain injunctive relief. Finally, the trial court found Smith did not establish by a preponderance of the evidence his remaining counterclaims.
 {¶ 8} Both Video Shack and Smith timely filed notices of appeal from the trial court's July 19, 2001 judgment. Subsequently, Video Shack filed a motion in this court for a limited remand in order for the trial court to rule on a motion for clarification of the July 19, 2001 judgment entry. This court granted a limited remand for clarification for 60 days. The trial court ruled on the motion for clarification in a December 27, 2001 judgment entry. But the court found it erred in its original judgment entry and modified the July 19th order to correct that error. Additionally, the court entered this judgment after the limited remand expired. Neither party filed a notice of appeal from the December 27, 2001 journal entry.
 {¶ 9} Before addressing the merits of the parties' alleged errors, we must determine whether the trial court's December 27th judgment is properly before this court.
 {¶ 10} An appellate court is vested with the jurisdiction to reverse, affirm, or modify a judgment from which a party has filed a proper notice of appeal. R.C. 2505.02(B); App.R. 12(A)(1)(a). Once the appellant files a notice of appeal, the trial court retains all jurisdiction not inconsistent with the reviewing court's jurisdiction to reverse, affirm, or modify the judgment. Howard v. Catholic Social Serv.of Cuyahoga Cty., Inc. (1994), 70 Ohio St.3d 141, 146.
 {¶ 11} Video Shack filed a proper notice of appeal on August 16, 2001. Where a party files a timely notice of appeal from a final order, this action divests the trial court of jurisdiction to alter the order.Stewart v. Zone Cab of Cleveland, 8th Dist. No. 79317, 2002-Ohio-335, citing Harkai v. Scherba Industries, Inc. (2000), 136 Ohio App.3d 211,215; Yee v. Erie Cty. Sheriff's Dept. (1990), 51 Ohio St.3d 43, 44; In reKurtzhalz (1943), 141 Ohio St. 432. At this point, the trial court was divested of jurisdiction to do anything that might interfere with this court's jurisdiction to reverse, affirm, or modify the July 19, 2001 judgment.
 {¶ 12} In issuing the limited remand for clarification of the July 19th judgment, we vested the trial court with jurisdiction to clarify its judgment. Additionally, we gave it 60 days within which to do so. In issuing its December 27th judgment, the trial court failed to clarify its July 19th judgment. Instead, the court modified part of its July 19th judgment. In doing so, the trial court overstepped its jurisdictional bounds. A trial court does not have jurisdiction to change its rulings on issues that are complained of on appeal. Kovac v. Whay Corp. (Oct. 20, 1994), 8th Dist. No. 65469. Furthermore, it did so after the 60-day time limit had expired. Thus, the trial court had no jurisdiction to enter the December 27th judgment. Not only did the trial court fail to act within the remand time we prescribed, but it also stepped on our jurisdictional feet in modifying a judgment that was on appeal to this court. "Where the trial court enters an order without jurisdiction, its order is void and a nullity. Cashelmara [Condominium Unit Owners v. Cashelmara Co. (July 15, 1993), Cuyahoga App. No. 63076]. A void judgment puts the parties in the same position they would be in if it had not occurred. Id., citing Romitov. Maxwell, Warden (1967), 10 Ohio St.2d 266, 267." Stewart, 8th Dist. No. 79317. For these reasons, the December 27th judgment is a nullity.
 {¶ 13} The parties were not required to file a new notice of appeal from the December 27th judgment. Had this court not ordered the limited remand, the trial court would not have issued another judgment. When we grant a limited remand for clarification, the trial court's clarification order is part of the original appeal. The trial court is clear in its December 27th judgment that it is entering its judgment perthe referral from the Court of Appeals. As long as this court grants a remand and the trial court is clear in its judgment that it is responding to this court's remand, there is no reason to require a separate notice of appeal as the jurisdiction of this court has already been properly invoked.
 {¶ 14} We now turn to the parties' assignments of error. Video Shack raises one assignment of error, which states:
 {¶ 15} "THE TRIAL COURT ERRED IN FINDING THAT APPELLEE MET HIS BURDEN OF PROOF AND ESTABLISHED BY CLEAR AND CONVINCING EVIDENCE HIS ADVERSE POSSESSION CLAIM TO PROPERTY OWNED BY THE APPELLANT AND THUS THE TRIAL COURT'S DECISION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 16} Video Shack's assignment of error deals with the northern boundary of the grange/white house property. It contends Smith did not prove the elements of adverse possession. It points to Patricia Freeman's testimony for support. Ms. Freeman, who was involved in a land contract deal to buy part of the property, testified on cross-examination that she kept chickens and ducks and that she gave the Heckathorns eggs to use their property. (Tr. 119). Video Shack contends this testimony breaks the continuous chain of adverse possession. It also contends that the court's finding that Ms. Freeman believed the corner post and the fence line made up the property line was inconsistent with the evidence. If this statement was true, Video Shack contends, the shed on the property would have been bisected by the property line.
 {¶ 17} "To acquire title by adverse possession, a party must prove, by clear and convincing evidence, exclusive possession and open, notorious, continuous, and adverse use for a period of twenty-one years."Grace v. Koch (1998), 81 Ohio St.3d 577, syllabus. In order to establish the necessary twenty-one year period, a party may add to his own term of adverse use any period of adverse use by prior succeeding owners in privity with one another. Zipf v. Dalgarn (1926), 114 Ohio St. 291, syllabus. Clear and convincing evidence is that proof which establishes in the minds of the trier of fact a firm conviction as to the allegations sought to be proved. Cross v. Ledford (1954), 161 Ohio St. 469, 477. Where a party must prove a claim by clear and convincing evidence, a reviewing court must examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. State v. Schiebel (1990), 55 Ohio St.3d 71, 74.
 {¶ 18} Failure of proof on any of the elements of adverse possession results in failure to acquire title by adverse possession.Grace, 81 Ohio St.3d at 579. "A successful adverse possession action results in a legal titleholder forfeiting ownership to an adverse holder without compensation. Such a doctrine should be disfavored, and that is why the elements of adverse possession are stringent." Id., at 580, citing 10 Thompson on Real Property (Thomas Ed. 1994) 108, Section 87.05.
 {¶ 19} It is the visible and adverse possession with an intent to possess which constitutes the adverse character of the occupancy. Grace,81 Ohio St.3d at 581, citing Humphries v. Huffman (1878), 33 Ohio St. 395,402. In other words, "`there must have been an intention on the part of the person in possession to claim title, so manifested by his declarations or his acts, that a failure of the owner to prosecute within the time limited, raises a presumption of an extinguishment or a surrender of his claim.' (Emphasis sic.)" Grace, 81 Ohio St.3d at 581, quoting Lane v. Kennedy (1861), 13 Ohio St. 42, 47. Courts do not require the title owner of the property receive actual notice of adverse possession as long as that owner is charged with knowledge of adverse use when one enters into open and notorious possession of the land under a claim of right. Vanasdal v. Brinker (1985), 27 Ohio App.3d 298, 299. The adverse occupancy of the land must be sufficient to notify the real owner of the extent of the adverse claim. Humphries, 33 Ohio St. at 404.
 {¶ 20} In order to establish adverse possession of the area between the survey line up to the fence line north of the white house, Smith presented his testimony along with that of previous property owners. According to that testimony, Carl Pennell owned that property from 1952 until 1973 when he sold it to some unidentified person. Gary Griffith acquired the property and sold it to Ms. Freeman on a land contract in 1989. Ms. Freeman continued with the land contract sale until 1995 when the Griffiths were unable to make the payments to the bank. Griffith then sold the property to Smith in 1995.
 {¶ 21} Video Shack bases its argument that Smith failed to establish adverse possession of this portion of the disputed property upon Ms. Freeman's testimony. A large shed was built on the back of the white house property along the property line. That shed was not built by Pennell or Ms. Freeman and Ms. Freeman assumed Griffith built it. The north side of the shed was near the northern fence line between the white house property and Video Shack property. Ms. Freeman knew that although the shed was inside the fence line, the property line actually ran through the middle of the shed. Ms. Freeman testified, "I just — I just knew [some of the land the shed was on] wasn't ours, but nobody never said nothing. You know." (Tr. 121). Ms. Freeman used the shed, her children played in the area up to the fence line, and she mowed that area. Ms. Freeman also testified that she and her fiancé gave chicken and duck eggs to the Heckathorns so that they would continue to allow her to use the shed, which she knew was on their property. (Tr. 128).
 {¶ 22} Ms. Freeman's use of the shed and maintenance of the area between the shed and the fence line could manifest to others that Ms. Freeman believed she owned the property up to the fence line. But as Ms. Freeman's testimony demonstrates, she never intended to claim title to that area between the actual property line and the fence line. Because Ms. Freeman did not intend to claim the land as her own, her possession was not adverse to the title owner's claim to the property. See Grace, supra; Humphries, supra. Because Ms. Freeman's possession was not adverse to that of the title owner, the trial court could not find Smith owned the property via adverse possession. Thus, Video Shack's sole assignment of error has merit.
 {¶ 23} Smith raises two assignments of error, the first of which states:
 {¶ 24} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR AND ABUSED ITS DISCRETION WHEN AFTER RENDERING ITS DECISION FINDING ADVERSE POSSESSION TO A FENCE LINE, IN AN ATTEMPT TO `CLARIFY ITS DECISION', THE COURT REVERSED ITS OPINION ON THE VERY PROPERTY BEING DISPUTED."
 {¶ 25} This assignment of error deals with the western boundary of the grange/white house property. In its July 19th judgment, the trial court found that Smith did not prove adverse possession because he could not prove that he used the property along the western boundary of his land exclusively. Smith's argument focuses on adverse possession and demonstrating that he proved at trial that his use of the disputed property, or that of his predecessors, was continuous, open, adverse, and hostile for 21 years.
 {¶ 26} As we have already stated, the trial court's December 27th judgment is void. This resolves any argument that the court erred in changing its July 19th judgment.
 {¶ 27} Accordingly, Smith's first assignment of error is moot.
 {¶ 28} Smith's second assignment of error states:
 {¶ 29} "THE TRIAL COURT ABUSED ITS DISCRETION, WHEN AFTER HEARING SUBSTANTIAL PROBATIVE EVIDENCE AND TESTIMONY IN SUPPORT OF DEFENDANT'S CLAIM OF BEING DAMAGED BY PLAINTIFF'S ACTS, IN DIVERTING A WATER COURSE ONTO DEFENDANT'S PROPERTY AND INTO DEFENDANT'S HOME AND OR THE HARASSMENT OF DEFENDANT BY PLAINTIFF AND HIS CHILDREN; BY FINDING LACK OF PREPONDERANCE OF EVIDENCE TO PROVE DEFENDANT'S CLAIMS."
 {¶ 30} Smith argues the trial court erred because he proved his other counterclaims by a preponderance of the evidence. A trial court's decision is against the weight of the evidence if it is not supported by competent, credible evidence. State ex rel. Shady Acres Nursing Home,Inc. v. Rhodes (1983), 7 Ohio St.3d 7, 8.
 {¶ 31} Smith made four claims against Video Shack and the Heckathorns in addition to his claim for adverse possession. First, he claimed the Heckathorns filled in a permanent waterway which overflowed its natural boundaries. Second, he claimed they allowed Video Shack's customers to block his driveway. Third, he claimed they installed a faulty sewage system on Video Shack's property which leaked onto his property. Finally, he claimed they threatened him. He alleged each of these acts caused him both physical and emotional damage.
 {¶ 32} In his first counterclaim Smith contended the Heckathorns filled a permanent waterway. A creek ran across Smith's property from Video Shack's property. Near the street, Smith built a culvert to direct the stream into a drain pipe. A couple of times, that stream flooded in the area near the culvert. After the flooding, Smith examined the drain area and found scrap metal acting as a grate. However, Smith introduced no evidence that the scrap metal caused the flooding. Furthermore, Smith introduced no evidence that the Heckathorns were the ones who put the scrap metal in the culvert. There is no evidence tying the Heckathorns to the flooding.
 {¶ 33} Smith's second counterclaim alleged the Heckathorns allowed Video Shack's customers to park in his driveway, blocking his way out which caused him to build a new driveway. However, on cross-examination, Smith admitted he told the Heckathorns he did not care if cars parked there and never told them otherwise "[t]o this day." (Tr. 229). Thus, the Heckathorns never knew Smith did not want their customers to park in the driveway. The Heckathorns were only doing what Smith had given them permission to do.
 {¶ 34} In his third counterclaim, Smith contended the Heckathorns installed a faulty sewage system on Video Shack's property which caused water to leak onto his property. The evidence showed the only sewage system installed by the Heckathorns on Video Shack's property was a french drain placed between the two properties, which was jointly installed by the parties. Smith argues the Heckathorns used this improperly which caused water to enter his basement. But as the trial court stated, while "there is some circumstantial evidence" the water was leaking into the Grange's basement due to the Heckathorns' actions "it is just as likely or probable that it is due to the lack of gutters on the roof and the fact that the basement is a hand dug basement where none existed before." (July 19th judgment entry). Once again, there is no evidence tying the Heckathorns' actions to Smith's wet basement other than Smith's speculations.
 {¶ 35} In his final counterclaim, Smith asserted the Heckathorns harassed him by shooting bullet holes into his trailer and lawn furniture and by leaving deer carcasses on Video Shack's property. Although there is evidence that the Heckathorns did skeet shoot on Video Shack's property, Smith never saw the Heckathorns shoot in the direction of his property. In addition, there is no evidence that the Heckathorns left the deer carcass on their property to harass Smith. Furthermore, there is no evidence on the record demonstrating the amount of damages Smith may have suffered as a result of the Heckathorns' alleged acts.
 {¶ 36} In summing up Smith's second assignment of error, the trial court properly denied Smith's counterclaims because competent, credible evidence does not exist in the record to support those claims. Thus, the trial court's decision was not against the weight of the evidence and Smith's second assignment of error is without merit.
 {¶ 37} For the reasons stated above, the trial court's decision is hereby reversed as to that part of the trial court's July 19, 2001 order with regard to Smith's counterclaim for adverse possession of the northern boundary of the disputed property. The northern boundary shall be as set out in the Edwin Browne survey. The remainder of the decision is hereby affirmed.
Vukovich, J., concurs.
DeGenaro, J., concurs in part and dissents in part; see concurring in part and dissenting in part.